Jeffrey J. Neuman (*pro hac vice* forthcoming)
Jeff@jjnsolutions.com
JJN Solutions, LLC
9445 Brenner Ct.
Vienna, VA 22180
Telephone: (202) 549-5079

Isaac S. Crum, #026510
icrum@messner.com
MESSNER REEVES LLP
7250 N. 16th St. Ste 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile: (303) 623-0552

*Attorneys for Crisby Studio AB, and Niklas Thorin*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Crisby Studio AB, a Swedish limited liability company, and Niklas Thorin, a Swedish resident,<br><br>Plaintiffs,<br><br>v.<br><br>GoDaddy, Inc., a Delaware corporation, GoDaddy.com, LLC, a Delaware corporation, and 123-Reg Limited, a UK company,<br><br>Defendants. | Case No.<br><br>**PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION** |

Plaintiffs Crisby Studio AB, and Niklas Thorin ("Crisby" or "Plaintiff"), by and through its attorneys, respectfully move this Court pursuant to Fed. R. Civ.P. 65 and Local Rule 65.1 for:

(1) A temporary restraining order enjoining Defendants GoDaddy, Inc., GoDaddy.com, LLC and 123-Reg Limited (collectively "GoDaddy"), its officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with it, from directly or indirectly causing the expiration of the calor.com domain name ("Domain") or allowing the Domain to revert to the registry to be generally available for purchase by third parties;

(2) a temporary restraining order enjoining Defendants GoDaddy from preventing or frustrating Plaintiffs' right, pursuant to the Domain Name Registration Agreement pursuant to the Domain Name Registration Agreement with GoDaddy, to renew the registration of the Domain;

(3) a temporary restraining order enjoining Defendants GoDaddy, their officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with them from selling, or otherwise transferring ownership, or allowing others to sell or transfer ownership interest in the Domain to any party, or purchasing or accepting ownership interest in the Domain; and

(4) an order to show cause why a preliminary injunction should not issue, pursuant to Fed. R. Civ. P. 65, enjoining Defendants from directly or indirectly committing the above-described acts during the pendency of this action.

## FACTUAL BACKGROUND

### A. *Defendants' Dual Role as Domain Name Registrar*

Defendants' GoDaddy have two distinct and separate roles relevant to this dispute. First, it operates an ICANN-Accredited domain name registrar under an agreement with the Internet Corporation Names for Assigned Names and Numbers ("ICANN"). More specifically, ICANN defines a "registrar" as an organization through which individuals and

1

entities (registrants) register domain name.[1] "During the registration process, a registrar verifies that the requested domain name meets registry requirements and submits the name to the appropriate registry operator. Registrars are also responsible for collecting required information from registrants and making the information available through WHOIS. After registration, registrants can make updates to their domain name settings through their registrars."[2] Domain name setting include pointing the domain name to a particular website, inserting "MX records" to establish e-mail accounts, and adding other records relating to the use of a domain name.

An ICANN-Accredited Registrar is one that has entered into a Registrar Accreditation Agreement ("RAA") with ICANN.[3] In order to serve as a registrar for any gTLD (including .com), registrars must be ICANN Accredited. The RAA sets for the terms and conditions by which registrars may register, renew and/or delete domain names. In addition, it also sets forth the minimum standards for the performance of registration functions, which not only includes registration services, but also the maintenance and modification of domain name records associated with domain names (e.g., adding Name Server records to point to websites, or MX records to point to e-mail accounts, etc.).

**B.    *Defendant GoDaddy's Separate Role as a provider of Aftermarket Services***

ICANN-Accredited registrars may, and often do, provide other value-added services which are not generally regulated by ICANN through the RAA, including website hosting, e-mail services, and domain name after market services. These services are ones that can also be provided by other entities who are not domain name registrars nor are they accredited by ICANN or any other regulator.

In other words, although a domain name registrar can provide e-mail hosting or web hosting services, not all e-mail hosting or web hosting providers are domain name

---

[1] See definition of "registrar" at https://www.icann.org/en/icann-acronyms-and-terms?nav-letter=r&page=1.
[2] *Id.*
[3] *Id.*

2

registrars. Similarly, you can register a domain name through one registrar, but use another entity (who may or may not be a domain name registrar) to provide e-mail or website hosting. For example, one can register a domain name through GoDaddy's registrar, but have its e-mail hosted on the Microsoft 365 platform. In order to do this, you must update your domain name records at GoDaddy (as a Registrar), to point to Microsoft (as an e-mail provider).

One set of non-registrar services Defendants' GoDaddy provides is what Defendants' call "aftermarket services." According to Defendants' latest 10K filed with the Securities and Exchange Commission on February 29, 2024[4], it offers domain name aftermarket services to enable the purchase and sale of previously registered domain names through an online auction, an offer/counteroffer transaction, or a "buy now" transaction (collectively "Aftermarket Services").

Aftermarket services are services that do not have to be provided by domain name registrars, but rather can be, and often are, provided by third parties. In addition, one may use Defendant GoDaddys' registrar services and a third party's aftermarket auction services. The provision of Aftermarket services therefore are distinct and separate from Defendants' registrar services even though they may be provided by the same or affiliated entities.

C. **_Defendants' Non-Registrar Expiring Domains Aftermarket Service_**

Prior to Plaintiff's ownership of calor.com, the previous owner of the Domin Name was Calor Gas Ltd, located in the United Kingdom. It was registered using the Defendants' 123-Reg Limited (123Reg) registrar. 123 Reg was acquired by GoDaddy in 2017 as part of GoDaddy's purchase of 123 Reg's parent company, Host Entertainment Group.

123Reg describes the process it follows as a domain name registrar when a domain name expires at https://www.123-reg.co.uk/support/domains/what-is-the-domain-recovery-period-and-how-can-i-restore-my-domain-names/, set forth as Exhibit A of the

---

[4] See https://www.sec.gov/ix?doc=/Archives/edgar/data/0001609711/000160971124000022/gddy-20231231.htm at p. 10,, accessed on August 19, 2024.

3

Verified Complaint and Application for Temporary Restraining Order and Injunction ("Complaint"). More specifically, 123 Reg will try to auto-renew at the standard renewal price for up to fifteen (15) days after a domain name expires provided that the registrant of the domain name has enabled the "auto-renew" function in its registrar account or if the registrant affirmatively manually renews and pays for the domain name in that time period. *Id.*. If the domain name has not been renewed during that time period, the "domain will be auctioned" by 123 Reg's auction service provider. *Id.* Although an auction will begin on the domain name, the existing registrant will be allowed to recover the domain name at the standard renewal price for an additional fifteen (15) days.

If the domain name has not been renewed within thirty (30) days after the expiration of the domain name, the "Domain is not recoverable" by the registrant. "This timeframe is reserved for auction bids and backorders." *Id.* As part of its registration agreement with Defendant 123Reg, the registrant gives permission for its name to be sold to another registrant through its auction service provider, Defendants' GoDaddy.

If there are no bids on the domain name in the auction, or if there are no "backorders" on the domain name, the domain name will enter a "Redemption Grace Period" and can be recovered by the original registrant through 123Reg for the standard domain name renewal fee plus an additional redemption fee.

### D. *Plaintiffs acquired Calor.com through Godaddy's Non-Registrar Aftermarket Auction Service*

As an expired domain aftermarket service provider, Defendants' auction platform is housed at http://auctions.godaddy.com. According to Defendants' website, expired auctions last for ten (10) days.[5] "Once a bid is placed, the registrant can no longer renew the domain" with their domain name registrar even if they use GoDaddy as their registrar.

According to the WHOIS records prior to April 10, 2024, the Domain calor.com had an expiration date of February 25, 2024. The domain name was allowed to expire. In

---

[5] See https://www.godaddy.com/help/listing-types-for-godaddy-auctions-1525, which is also attached as Complaint Ex. B.

4

accordance with Defendant 123Reg's registrar policy, the domain name was placed into the Defendant GoDaddy's auction platform on or about March 10, 2024. On or about March 26, 2024, thirty (30) days after the Domain Name expired, the Domain Name registrant for Calor.com was changed to "Afternic, LLC", indicating both that the domain name was no longer recoverable by the previous registrant, as described above and that the domain name was under the control of Defendants' non-registrar after-market service. **Complaint Exhibit C** shows the WHOIS record from March 31, 2024.

Plaintiff Niklas Thorin (GoDaddy Customer number 41750938) placed a bid on the Domain Name for $11,405.00 ("Auction Bid Price") on or about March 31, 2024. (Declaration of Niklas Thorin ("Thorin Decl.") ¶¶ 2-3). On or about April 4, 2024, Plaintiff Thorin was notified that "the winning bidder of **Item Number 548251391**, **calor.com**, did not complete this transaction." See Complaint Ex. D. (emphasis in original). (*Thorin Decl. ¶ 4*). As the second highest bidder for the Domain Name, Plaintiff was declared the new winner of the Domain Name provided that Plaintiff completed the purchase of the Domain Name through the auction service platform and renewed the domain name through Defendants' registrar system within 24 hours of being notified. (*Id.*)

On April 5, 2024, Plaintiff Thorin made the required payment $11,427.17 (which included the Auction Bid Price payable to Defendants' auction service provider, plus the price of the Domain Name renewal payable to Defendants' registrar service provider ($22.17). (*Id.* ¶ 5). Confirmation of Plaintiff's payment was e-mailed to Plaintiff immediately after completing the order from Defendant. *See* Complaint Ex. E. (*Id.*). The confirmation states: "Thank you for your order, Niklas. Here is your confirmation for order number 2987847541. Review your receipt and get started using *your* products." (*emphasis added*)( *Id.*). The receipt identifies the Domain Name purchased as calor.com. (*Id.*)

At some point between April 5, 2024, and April 10, 2024, consistent with Plaintiffs' ownership of the Domain Name. Plaintiffs changed the DNS records of the Domain Name through Defendants' registrar service platform to point to the IP address 162.19.152.159,

5

1. which upon information and belief is operated by ClouDNS. Operating out of Bulgaria. This change allowed the Domain Name to resolve to the website content set forth in Complaint Ex. F.  The Website contains an Orange/Pink background with the word "CALOR" in a stylized font, followed by the Spanish words "Encuenta el Calor del Amor" (which loosely translates to "Find the Heat of Love" in English.  It then, in Spanish, invites users to send an email to beta@calor.com to access the service earlier. (*Id.* ¶6*)*. Plaintiffs subsequently modified the website to state that the owner of the domain name is Plaintiff's Swedish Company.  See Complaint Ex. G.  The Domain Name continues to resolve to this Website owned by Plaintiff as of the date of the filing of this Complaint. (*Id.)*

On or about that same time frame (between April 5, 2024 and April 10, 2024), Plaintiffs activated e-mail on the Domain Name by adding the "MX Records" of its e-mail provider, Migadu, a Swiss company.  (*Id.* ¶7*).*  Those MX records continue to be present in the DNS Records for the Domain Name as of the date of the filing of this Complaint. See Complaint at Ex. H. (*Id.*).

On May 27, 2024, Plaintiffs executed a Joint Venture Agreement ("JV Agreement") with QLSC Consulting S.R.L., a Romanian company with its principal office located at Str. Dristorului, m Sector 3, Municipuil Cucuresti ("QLSC") for the purpose of developing and launching a dating app targeting the global Spanish-speaking market, to be named after Plaintiff's .com domain name, CALOR.  In Spanish, the term "Calor" translated to "Heat" or "Hot" in English. (*Id.* ¶8).

As part of the JV Agreement, Plaintiffs had to agree to a standard warranty, namely that it "currently owns the domain name 'Calor.com'".  Plaintiffs also had to agree to the transfer of ownership of the domain name to the Joint Venture upon the achievement of certain milestones set forth in the JV Agreement.  Until such transfer, Plaintiffs contractually committed to "maintain ownership and control of the domain name." (*Id.* 9).

On May 29, 2024, a Sales Manager for Defendant reached out to Plaintiff Thorin via e-mail stating that they "recently had a client request our assistance in potentially acquiring the above domain which appears to be owned/ registered to you.  If you would

6

please confirm that you are still the registrant of this domain, and whether you would be open to discussing the sale of this domain. I would greatly appreciate it. If you are open to selling the domain, can you please provide me with a ballpark figure that you would be willing to consider selling it for?" (*Id.* ¶*10*) and Complaint Ex. I.

Later that same day, Plaintiff Thorin responded to Defendant putting in on notice that (a) it was already using the Domain Name to launch a project in early 2025, and that (b) it would only be willing to sell the domain name to Defendant's client for a high six-figure amount." (*Id.* ¶ 11) and Complaint Ex. J**.**

On June 4, 2024, just one day short of two (2) months after Plaintiff paid-for and took ownership of the Domain Name, and more than one hundred (100) days after the domain name expired for the previous registrant, Plaintiff received an e-mail from Defendant's "CEO Team" stating that "[D]ue to an unexpected error, the domain calor.com should not have been available for your purchase. To correct this error, we have removed the domain from your account and are taking proactive steps to prevent this error from happening again in the future. We have refunded your original purchase and have added a $350 in-store credit to your account for the inconvenience." (*Id.* ¶ 11) and Complaint Ex. K.

Despite the fact that Defendant had actual knowledge that (i) Plaintiffs were the rightful owners of the Domain Name, (ii) Plaintiffs were already using the Domain Name for a large project dependent on the Domain Name, (iii) the commercial launch of the services was already planned to be launched in early 2025, and (iv) in response to Defendant's own sales agent's offer to purchase the Domain Name, Plaintiffs were unwilling to do so unless Plaintiffs were compensated for the loss of their business, Defendant unilaterally removed the Domain Name from Plaintiffs' GoDaddy registrar account thereby removing Plaintiffs' ability to use the Domain Name. (*Id.* ¶ 13).

The removal of the Domain Name from Plaintiffs' registrar account not only meant the loss and control of Plaintiffs' property, but also put Plaintiffs in breach of the JV Agreement that was executed with QLSC. As a direct result of Defendant's wrongful

taking of Plaintiffs' property, Defendant caused QLSC to terminate the JV Agreement with Plaintiff and significantly damaged the reputation of Plaintiffs and the relationship with QLSC. (*Id.* ¶¶ 14-15).

### E. **Plaintiffs Will be Irreparably Injured without the granting of a Temporary and Preliminary Injunctions**

Without the issuance of a Temporary and/or a Preliminary injunction, the Domain may be transferred, sold or otherwise registered by a non-party to this lawsuit. In addition, the Domain may be transferred to a party that is outside the jurisdiction of this or any other United States court. The granting of a TRO will ensure that the status quo is maintained with the Domain until the court can rule on the merits of this case.

## LEGAL STANDARD

The standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). However, a TRO's requirements are less rigid since a TRO's duration is much shorter than a preliminary injunction. *L.A. Unified Sch. Dist. v. U.S. Dist. Ct.*, 650 F.2d 1004, 1008 (9th Cir. 1981).

To obtain a TRO, plaintiff must demonstrate that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities" tips in its favor, and (4) an "injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

In certain cases, a TRO may be issued where there are "serious questions going to the merits" and the hardship balance tips sharply toward the plaintiff, assuming the other elements are met. *Alliance for the Wild Rockies*, 632 F.3d at 1132. Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (internal citations omitted).

This Court may issue a TRO without notice to Defendants if (1) an affidavit or verified complaint demonstrates that Plaintiffs will suffer "immediate and irreparable loss, injury, or damage" if an injunction does not issue before the adverse party can be heard or (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1); L.R. Civ. 65.1 ("*Ex parte* restraining orders shall only be issued in accordance with Rule 65, Federal Rules of Civil Procedure."). A district court has broad discretion to issue a TRO. *Stuhlbarg Int'l Sales Co. v. 2John D. Brush & Co.*, 240 F.3d 832, 841 n. 8 (9th Cir. 2001).

## ARGUMENT

This Court's intervention is necessary to protect Plaintiffs' rights and interests in the calor.com Domain and to block Defendants' GoDaddy from improperly depriving Plaintiffs of their ability to access and control the Domain to which it is a beneficial registrant. A TRO is further necessary to enjoin the improper and unlawful effort to transfer ownership in the Domain to a third party, which would cause immediate and irreparable harm to Plaintiffs' and potentially open the door to allowing the Domain to escape from this Court's jurisdiction and/or cause additional damage to a third party if Defendants' transfer this name to that third party and it has to be returned to Plaintiffs' as a result of this action.

Temporary Restraining Orders are routinely granted in domain name cases in Arizona to ensure that the status quo is maintained. Usually, the domain name registrar is a third-party to those matters. See e.g. Order issued in *Whaleco Incorporated v. TemuExpress.com, et. al.,* No. CV-23-02243-PHX-MTL, Document 13 as amended by Document 16 (Nov. 3, 2023 as amended on November 16, 2023); *See also Orchid Labs Inc. v. Anonymous Ultimate Licensee of Sale-Orchid.Com*, No CV-18-00582-PHX-DJH, 2018 U.S. Dist. LEXIS 250142, at1-2 (D. Ariz. May 4, 2018)(granting the plaintiff's motion against the defendants and ordering "the transfer of the domain. . . to 'Plaintiff' and 'non-party GoDaddy, ad registrar.'"). It is even more critical that a TRO issue where the

9

entity serving as domain name registrar itself is one of the entities to have committed the wrongful act.

### A.    CRISBY IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST DEFENDANTS.

Plaintiffs are entitled to injunctive relief if it shows a likelihood of success on the merits of any one of its claims. Indeed, Plaintiffs can show that they are likely to prevail on each of its claims for relief.

#### 1.    Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing

Plaintiffs will succeed on their claim again Defendant GoDaddy for breach of contract and breach of the covenant of good faith and fair dealing. As the evidence and supporting declarations show, Crisby and Defendants' relationship is governed by the parties' Auction Membership Agreement ("AMA") and Domain Name Registration Agreement ("DNRA") (Thorin Decl. ¶¶ 3, 5). See Complaint Ex. N and O. Under the AMA, Plaintiff was declared the winner of the Domain Name auction, paid for the Domain Name, and the Domain Name was placed into Crisby's registrar account. At that point both parties performed all of their responsibilities under the AMA. In addition, Crisby renewed the Domain Name registration under the DNRA by paying the required renewal fee.

Defendant GoDaddy breached the terms of both the AMA and the DNRA by improperly using its role as a domain name registrar to reverse an alleged "error" on the part of the auction service provider (which happened to also be the Defendant). The DNRA does not provide the ability of Defendant as an auction service provider to use its domain name registrar to engage in such activity and therefore constitutes a breach of the DNRA. Plaintiffs will succeed on their breach of contract claim. *See Varrato v. Specialized Loan Servicing LLC, No. CV-22-00324-PHX-MTL, 2022 WL 845194* (D. Ariz. Mar. 22, 2022) (granting TRO where plaintiffs sought to enjoin Defendant from conducting a trustee's sale on their home); Highway Techs., Inc. v. Porter, 2009 WL 1835114 (D. Ariz. June 26, 2009).

Furthermore, there is nothing in either the AMA or the DNRA that gives Defendants the right to remove domain names from their customers' accounts absent a breach of the AMA or DNRA on the part of the registrant. It certainly does not include the correction of alleged errors by an auction service provider. In fact, the only reason Defendant was able to physically remove the Domain from Crisby's account was because Defendant was also the registrar of the Domain. If Crisby had elected to transfer the Domain to another registrar, Defendants would not have been able to remove the Domain. Therefore, Defendants' GoDaddy improperly used its role as a domain name registrar to nullify a non-registrar Aftermarket Service. This is a classic instance of a breach of a covenant of good faith and fair dealing. See *Rawlings v. Apodaca*, 151 Ariz. 149, 153 (1986) ("The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship"); *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 768 (D. Ariz. 2013) ("The covenant acts to prevent a party from doing something that, while not specifically prohibited by a contract, prevents the other party from enjoying benefits they reasonably expected to flow from the contract.").

Even if in the unlikely circumstance that Defendants did have a right to comingle its services and remove the Domain from Plaintiffs' account, doing so more than two months after the domain name was purchased, after it actually knew that Plaintiffs were using the Domain to launch new products that were dependent on the Domain, is unconscionable.

    2.    <u>Gross Negligence</u>

In Arizona, gross negligence is defined as a reckless disregard for the rights or safety of others, going beyond mere carelessness to include actions that show a deliberate indifference to the consequences. See *Lutfy v. Lockhart*, 37 Ariz. 488, 295 P. 975 (1931). Defendant's conduct in this matter clearly meets this standard.

Plaintiffs participated in and won an auction for the Calor.com Domain Name through Defendant's auction platform. Plaintiff fulfilled all obligations associated with the

11

auction, including payment in full for the domain name. In addition, Plaintiffs fulfilled all obligations associated with the renewal of that Domain Name through Defendants' registrar services. Despite this, Defendants' acting through their registrar subsequently reclaimed the domain name from Plaintiffs, asserting that the Defendants (acting as an aftermarket service provider) should not have included the Domain Name in the auction due to an alleged and unspecified "error."

Defendants' actions were grossly negligent in several respects:

- **Failure to Verify Auction Rights:** If indeed the Domain Name was placed into Defendants' auction platform due to an error, then Defendants failed to perform any meaningful due diligence before including the Domain Name in the auction. A competent and responsible auction services provider would have verified its legal right to auction the domain name before listing it for sale. By neglecting this basic duty, Defendant exhibited a reckless disregard for the rights of all auction participants, including Plaintiffs.

- **Post-Auction Reclamation Without Justification:** Even after Plaintiffs' lawfully won the auction and took steps to utilize the domain name, Defendants wrongfully abused its role as a domain name registrar to unilaterally reclaim the Domain Name without providing any concrete evidence or legal justification for its actions. This arbitrary and capricious conduct not only deprived Plaintiffs of its valuable property but also undermined the integrity of Defendants' entire auction platform and process.

- **Failure to Mitigate Harm:** After recognizing its purported "error," Defendants' had the opportunity to mitigate the harm to Plaintiff by negotiating a reasonable solution or providing compensation. Instead, Defendant chose to exacerbate the situation by summarily reclaiming the domain name, causing further disruption to Plaintiff's business and reputation. In addition, this is exacerbated further because Defendants had actual knowledge that Plaintiffs had already been using the Domain Name for a new business that was completely dependent on the Domain Name.

*See* Complaint Ex. J and *Thorin Declaration* at 11.

As a result of Defendant's grossly negligent actions, Plaintiff is suffering irreparable harm that cannot be adequately remedied through monetary damages alone. The wrongful reclamation of the domain name has severely disrupted Plaintiff's business operations, damaged Plaintiff's reputation, and jeopardized relationships with customers and partners who rely on Plaintiff's online presence. The domain name in question is a unique digital asset, integral to Plaintiff's branding and online strategy, and its loss cannot be fully compensated through financial means.

### 3. *Tortious Interference with Prospective Economic Advantage*

Plaintiffs are also likely to prevail on their claim for tortious interference with prospective economic advantage. In Arizona, a claim for tortious interference with prospective economic advantage requires: "1. The existence of valid contractual relationship or business expectancy; 2. knowledge of the relationship or expectancy on the part of the interferor; 3. intentional interference inducing or causing a breach or termination of the relationship or expectancy; and 4. resultant damage to the party whose relationship or expectancy has been disrupted." *Miller v. Servicemaster by Rees*, 174 Ariz. 518, 521 (Ct. App. 1992).

On May 27, 2024, Plaintiffs executed a Joint Venture Agreement ("JV Agreement") with QLSC Consulting S.R.L., a Romanian company with its principal office located at Str. Dristorului, m Sector 3, Municipuil Cucuresti ("QLSC") for the purpose of developing and launching a dating app targeting the global Spanish-speaking market, to be named after Plaintiff's .com domain name, CALOR.

As part of the JV Agreement, Plaintiffs had to agree to a standard warranty, namely that it "currently owns the domain name 'Calor.com'". (*Id.* ¶ 8 ). Plaintiffs also had to agree to the transfer of ownership of the domain name to the Joint Venture upon the achievement of certain milestones set forth in the JV Agreement. *Id.* Until such transfer, Plaintiffs contractually committed to "maintain ownership and control of the domain name."

13

On May 29, 2024, a Sales Manager for Defendant reached out to Plaintiff Thorin via e-mail stating that they "recently had a client request our assistance in potentially acquiring the above domain which appears to be owned/ registered to you. If you would please confirm that you are still the registrant of this domain, and whether you would be open to discussing the sale of this domain. I would greatly appreciate it. If you are open to selling the domain, can you please provide me with a ballpark figure that you would be willing to consider selling it for?" *See* Complaint Ex. I.

Later that same day, Plaintiff Thorin responded to Defendant putting in on notice that (a) it was already using the Domain Name to launch a project in early 2025, and that (b) it would only be willing to sell the domain name to Defendant's client for a high six-figure amount." *See* Complaint Ex. J.

Defendants' wrongful removal of the Domain Name from Plaintiffs' registrar account not only meant the loss and control of Plaintiffs' property, but also put Plaintiffs in breach of the JV Agreement that was executed with QLSC. (*Thorin Declaration* ¶¶ 9, 14-15). . As a direct result of Defendant's wrongful taking of Plaintiffs' property, Defendant caused QLSC to terminate the JV Agreement with Plaintiff and significantly damaged the reputation of Plaintiffs and the relationship with QLSC. *Id.*.

**B.  CRISBY STANDS TO SUFFER IRREPARABLE HARM IF THE DOMAIN IS ALLOWED TO EXPIRE OR IT IS ALLOWED TO BE OPERATED BY, OR TRANSFERRED TO, A THIRD PARTY.**

In the absence of a TRO or injunction, Plaintiffs stand to continue to suffer substantial, immediate, and irreparable harm. Not only has Defendants' wrongful action deprived Plaintiffs of its property, but it has caused the Plaintiff to be in breach of commitments it made to a third party as part of a Joint Venture agreement to develop an application fully dependent on the Domain Name. The wrongful taking of Plaintiffs' Domain Name has already placed the launch of the planned service in Q1 2025 in jeopardy and has resulted in its indefinite delay.

Additionally, unless a temporary restraining order is granted, Defendants can significantly alter the status quo before the Court can determine the parties' respective rights. In particular, Defendants can take further actions to further transfer the domain name and remove it from this Court's reach. Such actions can happen instantaneously after Defendants are provided with notice of this action, thereby thwarting the Court's ability to grant meaningful relief.

Further, sudden expiration of the domain would also potentially open the door to the Domain Name being acquired by a third party that falls outside the jurisdiction of this Court.

### C. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF A TEMPORARY RESTRAINING ORDER

The balance of equities and the public interest heavily favor Plaintiffs here. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The temporary restraining order is limited in scope. It does nothing more than preserve the status quo and ensure that the Defendants do not take steps contrary to the Agreement or Plaintiffs' ownership interests in the domain. Indeed, courts have found that the public "has a strong interest in holding private parties to their agreements." *See Epic Games v. Apple Inc.*, 2020 WL 5073937, at *4 (N.D. Cal. Aug. 24, 2020). Further, Defendants will not face any legitimate harm due to the requested relief, which seeks only to prevent Defendants from unilaterally and improperly interfering with Plaintiffs' existing rights and interests in the Calor.com domain.

Absent an injunction from this Court, Plaintiffs might forever lose their control and ownership interest in the Calor.com Domain Name. (Thorin Decl. ¶ 16) In short, preserving the status quo during the pendency of this action is the most equitable outcome.

This Court recently in *True Names Ltd. v. GoDaddy Inc.* granted a Temporary Restraining Order (which was converted into a Preliminary Injunction Order) on September 5, 2022 against these same Defendants. No. CV-22-01494-PHX-JJT, 2022 WL 4121401 (D. Ariz. Sept. 9, 2022). Although the case did not involve Defendants'

aftermarket services, it did involve a domain name which the Plaintiffs' claimed was improperly taken by Defendants. In that case, this Court granted the preliminary injunction citing the Ninth Circuit Court of Appeals, employing a sliding scale analysis, has also stated "'serious questions going to the merits' and a hardship balance that tips sharply toward the [movant] can support issuance of an injunction, assuming the other two elements of the Winter test are also met." *Id.* at *1, quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1078 (9th Cir. 2013) cert. denied, 134 S. Ct. 2877 (2014) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)).

After converting its motion for a Temporary Restraining Order into a motion for a Preliminary Injunction, this Court in *True Names* found serious questions going to the merits and a hardship balance that tips sharply towards the Plaintiffs. *Id.* at *2. As a result, and recognizing that absent such an order, the domain name could be transferred to a third party, the Court entered an order:

(1) enjoining Defendants GoDaddy from directly or indirectly causing the expiration of the Domain or allowing the Domain to revert to the registry to be generally available for purchase by third parties (*id.*);

(2) enjoining Defendants GoDaddy from preventing or frustrating Plaintiffs' right, pursuant to the Domain Name Registration Agreement with GoDaddy, to renew the registration of the Domain (*id.*); and

(3) enjoining all Defendants from selling or otherwise transferring ownership interest in the Domain to any party, or otherwise purchasing or accepting any ownership interest in the Domain. *Id.*

This Court has also issued Temporary Restraining Orders / Preliminary injunctions in several other domain name cases. Although many of these cases have been in actions involving trademark infringement, the balance of hardships is similar because issuance of the restraining order / injunction would merely maintain the status quo and failure to issue the restraining order would cause Plaintiffs to suffer and incur additional expense in having to file additional lawsuit(s) if the domain name were to be transferred to other registrants

during the pendency of this action.  *See* Temporary Restraining Order and Order Setting Hearing on Preliminary Injunction *KeyState Holdings, LLC v. keystateholdings.com*, CV-32-02530-PHX-SMB (September 8, 2021); see also *Fornix Holdings LLC v. Unknown Party*, CV-22-00494-PHX-DLR (May 23, 2022).

## CONCLUSION

Plaintiffs are at risk of immediate and irreparable harm from Defendants. The Court should grant Plaintiffs' motions for a temporary restraining order and order to show cause. The Court should grant these requests *ex parte* and without advance notice to Defendants to preserve the *status quo* and permit the Court to grant effective relief on the merits of Plaintiffs' claims.

For the foregoing reasons, Plaintiffs respectfully request that the Court issue:

1. a temporary restraining order enjoining Defendants GoDaddy from directly or indirectly causing the expiration of the Domain or allowing the Domain to revert to the registry to be generally available for purchase by third parties;

2. a temporary restraining order enjoining Defendants GoDaddy from preventing or frustrating Plaintiffs' right, pursuant to the Domain Name Registration Agreement with GoDaddy, to renew the registration of the Domain;

3. a temporary restraining order enjoining all Defendants from selling or otherwise transferring ownership interest in the Domain to any party, or otherwise purchasing or accepting any ownership interest in the Domain; and

4. an order to show cause why a preliminary injunction should not issue, pursuant to Fed. R. Civ. P. 65, enjoining Defendants from directly or indirectly committing the above-described acts during the pendency of this action.

DATED:  August 23, 2024,

                                      */s/ Isaac S. Crum*
                                      Isaac S. Crum, #026510
                                      icrum@messner.com
                                      MESSNER REEVES LLP

7250 N. 16th St. Ste 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile: (303) 623-0552

Jeffrey J. Neuman (*pro hac vice* forthcoming)
Jeff@jjnsolutions.com
JJN Solutions, LLC
9445 Brenner Ct.
Vienna, VA 22180

*Attorneys for Crisby
Studio AB, and Niklas Thorin*

## **FEDERAL RULE OF CIVIL PROCEDURE 65 CERTIFICATION**

Counsel hereby certifies that on the same day this Motion was filed with the Court a copy was also served, along with the concurrently filed Complaint, on both GoDaddy Inc. and GoDaddy.com, LLC through their registered statutory agent in Arizona and they are on notice of this filing as of today. Regardless of this notice, given that Defendants' business is to broker and sell domain names—including the domain name at issue in this matter and as described in the Motion above—it is highly likely that the domain name at issue in this case will be sold or moved to a registrar beyond this Court's control if the normal notice and motion practice procedure are followed.  Or, if the domain name has already been sold and/or transferred to another entity, that that third party may remove Plaintiff's content from the current website, and/or remove Plaintiff's access to its e-mail account which use the Domain Name.  As explained above, this would result in irreparable harm to Plaintiffs.  For this reason, this Court must issue a TRO without written notice in order to ensure the domain is not transferred.