Jeffrey J. Neuman (Admitted *pro hac vice*)
Jeff@jjnsolutions.com
JJN Solutions, LLC
9445 Brenner Ct.
Vienna, VA 22180
Telephone: (202) 549-5079

Isaac S. Crum #026510
icrum@messner.com
MESSNER REEVES LLP
7250 N. 16th St. Ste 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile:  (303) 623-0552

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Crisby Studio  AB, a Swedish limited liability company,  Niklas Thorin, a Swedish resident, and Prime Loyalty, a New York limited liability company<br><br>Plaintiffs,<br><br>v.<br><br>GoDaddy, Inc., a Delaware corporation, GoDaddy.com, LLC, a Delaware corporation, and 123-Reg Limited, a UK company,<br><br>Defendants. | Case No. 2:24-cv-02165-SMB<br><br>FIRST AMENDED COMPLAINT<br><br>(Conversion, Trespass to Chattel; Breach of Auction Membership Contract; Breach of Registration Agreement; Breach of the Covenant of Good Faith and Fair Dealing as to GoDaddy Defendants; Tortious Interference with Prospective Economic Advantage as to All Defendants;  Tortious Interference with Contract; Gross Negligence, Negligence, Negligent Misrepresentation, Estoppel, Request for Injunctive Relief)<br><br>(Jury Trial Demanded) |

Plaintiffs Crisby Studio AB, Niklas Thorin ("Crisby"), and Prime Loyalty, LLC ("Prime")(collectively the "Plaintiffs") by and through their attorneys, for its Complaint against defendants GoDaddy, Inc., GoDaddy LLC, and 123-Reg Limited ("Defendants") alleges as follows:

1

**INTRODUCTION**

1.      This action arises from Defendants' breach of its various domain name registration and auction agreements by (a) co-mingling its roles as an ICANN-Accredited Registrar and its separate role as a provider of domain name auction services, (b) improperly using its role as ICANN-Accredited registrar to unilaterally misappropriate two valuable .com domain name, calor.com and butane.com ("Domain Names"), from Plaintiffs' GoDaddy registrar accounts more than two months after Plaintiffs purchased the Domain Names from GoDaddy's auction services and registered, paid for, and began using the Domain Names through GoDaddy's separate role as an ICANN-Accredited Registrar.

2.      By this action Plaintiffs seek the immediate return of the Domain Names to their respective accounts and compensation for damages actually incurred as a direct result of GoDaddy's wrongful actions.

**PARTIES**

3.      Plaintiff Crisby Studio AB is a limited liability company formed under the Country of Sweden, with a principal place of business located in Stockholm, Sweden (Reg. No. 556880-8892).

4.      Plaintiff Niklas Thorin is a Swedish citizen that currently resides in Vastra Gotaland, Sweden.

5.      Plaintiff Prime Loyalty, LLC is a limited liability with its principal place of business in Orangeburg, New York.

6.      Defendant GoDaddy, Inc., is a Delaware company with its principal place of business in Tempe, Arizona. Upon information and belief, GoDaddy Inc., has two distinct and separate roles relevant to this dispute.  First, it operates an ICANN-Accredited domain name registrar under an agreement with the Internet Corporation Names for Assigned Names and Numbers ("ICANN").  In this capacity, Defendant either itself, or through its subsidiaries, registers and renews domain names on behalf of its

customers.  This includes the management of the domain name records associated with the domain names that they register.  Separate and apart from its role as a ICANN-Accredited registrar, Defendant GoDaddy also offers domain name aftermarket services to enable the purchase and sale of previously registered domain names through an online auction, an offer/counteroffer transaction, or a "buy now" transaction (collectively "Aftermarket Services.").

7.    Defendant GoDaddy, LLC is a wholly owned subsidiary of GoDaddy, Inc. It is registered in Delaware with its principal place of business in Tempe, Arizona.  Upon information and belief, GoDaddy LLC, is the operating entity that manages and operates the ICANN regulated domain name registration services,  and Defendants' separate Aftermarket Services.

8.    Defendant 123-Reg Limited is a domain name registrar and is upon information and belief, wholly owned by either Defendant GoDaddy, Inc. or Defendant GoDaddy, LLC, and according to its website, http://123-reg.co.uk,  has its registered office in Middlesex, England.

## JURISDICTION AND VENUE

9.    This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. Defendants GoDaddy, Inc. and GoDaddy.com LLC (collectively, "GoDaddy") are registered in Delaware with their principal place of business in Arizona. Defendant 123-Reg Limited is wholly owned by GoDaddy and has a registered office in England. Plaintiffs are an "Aktiebolag", which is roughly equivalent to a Swedish limited liability company,  registered in Stockholm, Sweden, a person in residing in Vastra Gotaland, Sweden and a New York limited liability company. Further, the amount in controversy exceeds $75,000.

10.    Venue is proper in the District of Arizona pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because it is the judicial district in which the defendants have their

principal place of business and/or in which the events or omission giving rise to the claim occurred.

## **BACKGROUND**

11.     Defendants' Registrar Services Defendant GoDaddy, LLC is a domain name registrar accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN") to provide domain name registration services.  More specifically, ICANN defines a "registrar" as an organization through which individuals and entities (registrants) register domain name[1]  "During the registration process, a registrar verifies that the requested domain name meets registry requirements, and submits the name to the appropriate registry operator.  Registrars are also responsible for collecting required information from registrants and making the information available through WHOIS. After registration, registrants can make updates to their domain name settings through their registrars." [2]

12.     An ICANN-Accredited Registrar is one that has entered into a Registrar Accreditation Agreement ("RAA") with ICANN.  [3]  In order to serve as a registrar for any gTLD (including .com), registrars must be ICANN Accredited.  The RAA sets for the terms and conditions by which registrars may register, renew and/or delete domain names.  In addition, it also sets forth the minimum standards for the performance of registration functions, which not only includes registration services, but also the maintenance and modification of domain name records associated with domain names (eg., adding Name Server records to point to websites, or MX records to point to e-mail accounts, etc.).

13.     ICANN-Accredited registrars may, and often do, provide other value-added services which are not generally regulated by ICANN through the, including

---

[1] See definition of "registrar" at https://www.icann.org/en/icann-acronyms-and-terms?nav-letter=r&page=1.
[2] *Id.*
[3] *Id.*

website hosting, e-mail services, and domain name after market services.  However, the offering of these services is not in their registrar capacity, but rather in their separate capacities as a website hosting, e-mail, and aftermarket service providers.

14.     An illustration of this distinction is that ICANN does have certain requirements with respect to the expiration of domain names.  It requires that (a) registrars list in a public WHOIS database the expiration date of a domain name registration, (b) registrars must delete a domain name within 45 days of either the registrar or the registrant terminating a registration record[4], (c) registrars must provide notice to registrants about their deletion and auto-renew policies, and (d) the circumstances by which a domain name can be redeemed by the registrant after expiration of the domain name.  However, ICANN does not regulate how aftermarket services are offered, so long as they are consistent with the ICANN-Agreement.  In other words, those that are offering aftermarket services, like Defendants', are not doing so in their role as an ICANN-accredited registrar, but rather as a separate and distinct aftermarket service provider.

A.     Defendants' Expiring Domains Auction Service

15.     Upon information and belief, the previous owner of the Domin Name, Calor Gas Ltd, located in the United Kingdom.  It was registered using the domain name registrar, 123-Reg Limited (123 Reg).

16.     123 Reg was acquired by GoDaddy in 2017 as part of GoDaddy's purchase of 123 Reg's parent company, Host Entertainment Group.

17.     123 Reg describes the process it follows when a domain name expires at https://www.123-reg.co.uk/support/domains/what-is-the-domain-recovery-period-and-how-can-i-restore-my-domain-names/, set forth as Ex. A.

---

[4] See Expired Domain Deletion Policy, currently at
https://www.icann.org/resources/pages/registars/accreditation/eddp-en.

18.     More specifically, 123 Reg will try to auto-renew at the standard renewal price for up to fifteen (15) days after a domain name expires provided that the domain name registrar has been paid by the domain name registrant.  *Id.*

19.     If the domain name has not been renewed during that time period, the "domain will be auctioned" by 123 Reg's auction service provider  *Id.*  Although an auction will begin on the domain name, the existing registrant will be allowed to recover the domain name at the standard renewal price.

20.     If the domain name has not been renewed within thirty (30) days after the expiration of the domain name, the "Domain is not recoverable" by the registrant.  "This timeframe is reserved for auction bids and backorders."

21.     If there are no bids on the domain name in the auction, or if there are no "backorders" on the domain name, the domain name will enter a "Redemption Grace Period" and can be recovered by the original registrant, an additional redemption fee will apply.

22.     As 123 Reg is owned by Defendant, expired domain names that are auctioned use the GoDaddy aftermarket auction system, a marketplace designed for the buying and selling of previously owned or expired domain names.

23.     As an expired domain aftermarket service provider, Defendant's auction platform is housed at http://auctions.godaddy.com.  According to Defendant's website, expired auctions last for ten (10) days.[5]  "Once a bid is placed, the registrant can no longer renew the domain in their account."  *Id.*

B.     The Domain Names

24.     Upon information and belief, the Domain Names Calor.com and Butane.com had expiration dates of February 25, 2024, and was allowed to expire.

25.     Upon information and belief, the Domain Names were not renewed by the then-current registrant within fifteen (15) days after the expiration date.  In accordance

---

[5] See https://www.godaddy.com/help/listing-types-for-godaddy-auctions-1525, which is also attached as Ex. B.

with Defendant 123 Reg's policy, the Domain Names were placed into the Defendant GoDaddy's auction platform on or about March 10, 2024.

26.     On or about March 26, 2024, and March 27, 2024, thirty (30) days after the Domain Names expired, the Domain Name registrants for Calor.com and Butane.com respectively were changed to "Afternic, LLC", the registrant's name Defendant GoDaddy uses to indicate that the domain names were no longer recoverable by the registrant, as described in ¶ 23 above.  Ex. C shows the WHOIS records for Calor.com from March 31, 2024. Ex 1 shows the WHOIS record for Butane.com from March 27, 2024.

C.     Calor.com

27.     Plaintiff Niklas Thorin (GoDaddy Customer number 41750938) placed a bid on the Domain Name for $11,405.00 ("Calor.com Auction Bid Price") on or about March 31, 2024.

28.     On or about April 4, 2024, Plaintiff Thorin was notified that "the winning bidder of **Item Number 548251391**, **calor.com**, did not complete this transaction." (emphasis in original).  See Ex. D.  As the second highest bidder for the Domain Name, Plaintiff Thorin was declared the new winner of the calor.com  Domain Name provided that it completed the purchase of the domain name through the auction service platform and renewed the domain name through Defendants' registrar system within 24 hours of being notified.  *Id.*

29.     On April 5, 2024, Plaintiff Thorin made the required payment $11,427.17 (which included the Auction Bid Price payable to Defendants' auction service provider, plus the price of the Domain Name renewal payable to Defendants' registrar service provider ($22.17).   Confirmation of Plaintiff's payment was e-mailed to Plaintiff immediately after completing the order from Defendant.  See Ex. E.  The confirmation states: "Thank you for your order, Niklas.  Here is your confirmation for order number 2987847541.  Review your receipt and get started using *your* products." *Id.* (*emphasis added*).  The receipt identifies the Domain Name purchased as calor.com.

30.     At some point between April 5, 2024, and April 10, 2024, consistent with Plaintiff Thorin's  ownership of the Calor.com Domain Name. Plaintiff Thorin changed the DNS records of the Calor.com Domain Name through Defendants' registrar service platform to point to the IP address 162.19.152.159, which upon information and belief is operated by ClouDNS. Operating out of Bulgaria.  This change allowed the Calor.com Domain Name to resolve to the website content set forth in Ex. F.  The Website contains an Orange/Pink background with the word "CALOR" in a stylized font, followed by the Spanish words "Encuenta el Calor del Amor" (which loosely translates to "Find the Heat of Love" in English.  It then, in Spanish, invites users to send an email to  beta@calor.com to access the service earlier.  Plaintiffs subsequently modified the website to state that the owner of the domain name is Plaintiff's Swedish Company.  See Exhibit G.  The Domain Name continues to resolve to this Calor.com Website owned by Plaintiff as of the date of the filing of this Complaint.

31.     On or about that same time frame (between April 5, 2024, and April 10, 2024), Plaintiff Thorin activated e-mail on the Domain Name by adding the "MX Records" of its e-mail provider, Migadu, a Swiss company.  Those MX records continue to be present in the DNS Records for the Domain Name as of the date of the filing of this Complaint.   See Ex.  H.

32.     On May 27, 2024, Plaintiffs Thorin and Crisby executed a Joint Venture Agreement ("Crisby JV Agreement") with QLSC Consulting S.R.L., a Romanian company with its principal office located at Str. Dristorului, m Sector 3, Municipuil Cucuresti ("QLSC") for the purpose of developing and launching a dating app targeting the global Spanish-speaking market, to be named after Plaintiff's .com domain name, CALOR.  In Spanish, the term "Calor" translated to "Heat" or "Hot" in English.

33.     As part of the Crisby JV Agreement, Plaintiffs had to agree to a standard warranty, namely that it "currently owns the domain name 'Calor.com'".  Plaintiffs also had to agree to the transfer of ownership of the domain name to the Joint Venture upon

the achievement of certain milestones set forth in the JV Agreement.  Until such transfer, Plaintiffs  contractually committed to "maintain ownership and control of the domain name."

       D.    <u>Butane.com</u>

      34.    On March 27, 2024, a sales representative from Defendant GoDaddy contacted Plaintiff Prime to inform them that the domain 'Butane.com' was available as part of the 'expired auction' listings and suggested it as a name they might be interested in. See Ex. 2.

      35.    Prior to submitting any bids for the domain Butane.com, Plaintiff Prime secured investment funding from Mike Giordano, a long-time associate of Prime, with over twenty years of experience in the butane industry. Giordano had been engaged in the storage, distribution, and sale of butane-related products and services under a private white-label brand. Plaintiff Prime and Giordano mutually agreed that, should they successfully acquire the Butane.com domain name using funds contributed by both parties, they would establish a joint white-label butane business under the Butane.com brand, which Giordano would primarily oversee and manage.

      36.    Prior to the close of the auction on March 31, 2024, Plaintiff Prime submitted a bid for the domain name Butane.com in the amount of $19,755.00 (the "Butane.com Auction Bid Price"). On March 31, 2024, Plaintiff Prime was notified that its bid for item 548251390, the domain Butane.com, had been successful at the Butane.com Auction Bid Price. See Ex. 3.

      37.    Within minutes of receiving the notification of the winning bid, Plaintiff Prime made the required payment of $19,765.43, which included the Butane.com Auction Bid Price payable to Defendants' auction service provider, as well as a $10.43 domain name renewal fee payable to Defendants' registrar service provider. A confirmation of Plaintiff Prime's payment was promptly emailed upon completion of the transaction. See Ex. 4.

38.     On April 7, 2024, in connection with Plaintiff Prime's ownership of the Butane.com domain name, Plaintiff Prime purchased the following services from Defendant GoDaddy's registrar services: (i) "Full Domain Protection," intended to safeguard against unauthorized domain actions, including the unauthorized transfer of the domain name; (ii) an additional nine (9) renewal years for Butane.com, inclusive of Full Domain Protection; and (iii) the premium-priced domains Butane.net and Butane.org, to further protect the emerging Butane.com brand that Plaintiff Prime was actively developing. The total cost of these services to Plaintiff Prime amounted to $7,024.34. See Ex. 5.

39.     Additionally, on April 7, 2024, Plaintiff Prime migrated the Butane.com domain to its own nameservers and IP address (72.167.43.221) in order to begin developing the Butane.com website, establish new Butane.com email addresses, and launch its new brand. See Ex. 6. To further promote and safeguard this brand, Plaintiff Prime created a LinkedIn social media account for the Butane.com brand on April 7, 2024, followed by the creation of an Instagram social media account on May 11, 2024. See Exhibits 7 and 8.

40.     During the months of April and May 2024, Plaintiff Prime began its initial development of the Butane.com website as well as its butane business.  See Ex. 9[6]. According to the content that was displayed on the Butane.com website, "The Butane Brand mission is to establish itself as the foremost authority for everything related to butane. . . As the premier destination for all things butane, we will offer an extensive range of products and services tailored to various applications.  From household to industrial use, Butane.com is your one-stop shop for all things Butane." *Id.*  Plaintiff Prime was in

---

[6] The content that was developed for Butane.com (and subsequently taken down by Defendants on or about June 4, 2024) was still resolving at the domain name's former IP Adress.  For purposes of this Complaint, Plaintiff Prime reproduced that content and placed it onto Butane.net.  Despite now being on butane.net, this exact content was on butane.com up until June 4, 2024.

the process of acquiring butane fuel, butane lighters, butane torches, butane stoves and butane heaters. *Id.*

41.    While Plaintiff Prime took primary responsibility for developing the Butane brand—including marketing, social media presence, and overall promotion of the new business—Giordano worked with his existing management team to incorporate the new product lines. He began preparing one of his warehouses in South Florida, which had already been certified as OSHA-compliant for the storage of butane-related products, to accommodate the initial supply of Butane.com-branded items. Additionally, Giordano entered into contractual negotiations with his established network of suppliers, distributors, and vendors to carry the new Butane.com-branded products.

42.    E.    Defendant's Unauthorized Transfer of Domain Names On May 29, 2024, a Sales Manager for Defendant reached out to Plaintiff Thorin via e-mail stating that they "recently had a client request our assistance in potentially acquiring the above domain which appears to be owned/ registered to you.  If you would please confirm that you are still the registrant of this domain, and whether you would be open to discussing the sale of this domain.  I would greatly appreciate it.  If you are open to selling the domain, can you please provide me with a ballpark figure that you would be willing to consider selling it for?" See Ex. I.

43.    On that same day, approximately five minutes after sending the e-mail to Plaintiff Thorin the same Sales Manager for Defendant reached out to Plaintiff Prime via e-mail stating that they "had a buyer inquire about acquiring Butane.com.  Let me know your price on this one and I will do my best to get a deal in place."  See Ex. 10.

44.    Plaintiff Thorin responded to Defendant putting in on notice that (a) it was already using the Domain Name to launch a project in early 2025, and that (b) it would only be willing to sell the domain name to Defendant's client for a high six-figure amount."  See Ex. J.

11

45.     Plaintiff Prime responded to Defendant's Sales Manager, stating that it "curated an entire portfolio around the Butane.com Brand for a business that is currently in the butane space.  The intention for this business s to grow a global Butane brand and is currently open to a Joint Venture/Partnership."  See Ex. 10.  Plaintiff Prime also told Defendant's sales manager that if the buyer wanted to submit an offer, it would "present it to them."  Plaintiff Prime also made Defendant GoDaddy aware of the additional butane-related domain names Plaintiff Prime purchased to protect its new brand, including butanestore.com, butanefuel.com, butanegrills.com, and approximately twenty-six other domain names to complement the Butane.com, Butane.net and Butane.org domain names. *Id.*

46.     On June 4, 2024, sixty-five (65) days after Plaintiff Prime paid-for the Butane.com Domain Name, and just one day short of two (2) months after Plaintiff Crisby paid-for and took ownership of the Calor.com Domain Name, and more than one hundred (100) days after the Domain Names expired for the previous registrant, the Plaintiffs each received an e-mail from Defendant's "CEO Team" stating that "[D]ue to an unexpected error, the domain calor.com/butane.com should not have been available for your purchase. To correct this error, we have removed the domain from your account and are taking proactive steps to prevent this error from happening again in the future. We have refunded your original purchase and have added an . . . in-store credit to your account for the inconvenience." See Ex. K and 11.  Plaintiff Thorin was offered an in-store credit of $350. Ex. K.  Plaintiff Prime was offered an instore credit of $7,350 to offset the cost of the Butane.net and Butane.org.  See Ex. 11.  On the same date, Plaintiff Prime received a refund for the nine (9) additional renewal years for Butane.com, as well as for the Full Domain Protection fees associated with the Butane.com domain name. See Ex. 12.  However, no mention was made, nor were any refunds provided, for the additional domain names or services purchased in connection with the development of the Butane.com brand.

47.     Despite the fact that Defendants GoDaddy and 123-Reg had actual knowledge that (i) Plaintiffs were the rightful owners of the Domain Names, (ii) Plaintiffs were already using the Domain Names large projects dependent on the Domain Names, (iii) the commercial launch of the services for Calor.com was already planned to be launched in early 2025, and for Butane.com significant expenditures were undertaken to promote and protect the brand, and (iv) in response to Defendant's own sales agent's offer to purchase the Domain Name, Plaintiffs Thorin and Crisby were unwilling to do so unless Plaintiffs were compensated for the loss of their business and Plaintiff Prime indicated he would present an offer, but it was looking for partnerships and not a sale of the butane.com Domain Name,  Defendant unilaterally removed the Domain Names from Plaintiffs' GoDaddy registrar accounts thereby removing Plaintiffs' ability to use the Domain Names. Furthermore, after the Butane.com domain name was removed from Plaintiff Prime's account, Defendants replaced all of the curated content on Butane.com with a registrar parking page. This page not only offers the domain name for sale but also includes a variety of paid advertisement links, from which the Defendants are generating revenue.  See Exhibit 13.

48.     The removal of the Domain Names from Plaintiffs' registrar accounts not only meant the loss and control of Plaintiffs' property, but also: (i) put Plaintiffs Thorin and Crisby in breach of the JV Agreement that was executed with QLSC, and (ii) ended Plaintiff Prime's new butane sales business.  As a direct result of Defendant's wrongful taking of Plaintiffs' property, Defendant caused (a) QLSC to terminate the JV Agreement with Plaintiff and significantly damaged the reputation of Plaintiffs and the relationship with QLSC, and (b) irreparable damage to the reputation of Prime and his business partner (who is a prominent member of the butane sales industry).

49.     On June 17, 2024, Plaintiffs Thorin and Crisby through their counsel sent a letter to Defendants' Auction Disputes Team, Defendants' CEOTeam, and its legal department notifying Defendants of their breaches of contracts and requested the

13

immediate reinstatement of the domain name to Plaintiffs, a detailed written explanation for Defendants' actions in this matter, and compensation for damages incurred ("June 17th Letter").  See Ex. L.

50.     When no substantive response was received by Plaintiffs Thorin and Crisby to the Letter, on July 17, 2024, a follow up letter was sent by Plaintiffs through their counsel repeating its requests from the June 17th Letter.  See Ex. M.

51.     Finally on July 18, 2024, Defendants responded to Plaintiffs Thorin and Crisby essentially restating what it said on June 4, 2024.  Defendants provided no further detail on the nature of their "error", nor did Defendants return the Domain Name they misappropriated from Plaintiffs.

52.     On or about July 18. 2024, Defendant GoDaddy spoke with Plaintiff Prime about Defendant's unauthorized taking of the Butane.com domain name.  During that conversation Plaintiff Prime pressed for more information regarding the alleged "error" committed by GoDaddy but was told that they were working on gathering that information.   Plaintiff Prime made Defendant GoDaddy aware that it had spent a considerable amount of time, money and resources on developing out the Butane.com business prior to Defendant's unauthorized taking of the domain name.

53.     On July 23, 2024, Mat T from Defendant's Office of the CEO revealed that Defendant GoDaddy realized its "error" when its "Aftermarket Team received an inquiry about the domain."

54.     Subsequently, on August 5, 2024, Plaintiff Prime delivered to Defendant GoDaddy's CEO Team a list of expenses accrued for the Butane Brand as requested.  See Ex. 14.  "In addition to these tangible costs, there are intangible realized losses that canoe be calculated as easily.  Costs for supplier and client meetings, travel, lost opportunity costs, broken agreements, etc." *Id.*  Plaintiff Prime also revealed that "The actions taken have unfortunately compromised the integrity of our brand and undermined our reputation amongst our associates, investors, suppliers, and manufacturers.  This was all as a result

14

of GoDaddy's 12th hour realization of a seemingly unproven error." *Id.*  Plaintiff Prime reported marketing and developmental expenses exceeding $78,000. *Id.*

55.    On August 14, 2024, Defendant GoDaddy responded to Plaintiff Prime concerning the previously noted "error." In its response, GoDaddy stated, "GoDaddy experienced a technical error on our side that prevented the registrant at the time from renewing the domain. As a result, the domain expired and was subsequently acquired by you in an Expired Domain Auction." See Ex. 15. However, Defendant GoDaddy did not disclose when it became aware of the issue, nor did it provide any additional details regarding the alleged technical problem. Despite this, GoDaddy transferred the Butane.com domain name back to its previous owner. Id. Furthermore, Defendant GoDaddy acknowledged receipt of Plaintiff Prime's documentation outlining development and marketing costs, totaling over $78,000, yet only increased its compensation offer to Plaintiff Prime from $7,000 in in-house store credit to $10,000 in the form of a check. *Id.* Despite Defendant's explanation to Plaintiff Prime, it did not provide that explanation to Plaintiffs Thorin or Crisby.

## FIRST CLAIM FOR RELIEF
### (CONVERSION)

56.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 55 above and incorporate them by reference.

57.    On April 5, 2024, Plaintiffs became the rightful owners of the Domain Names and had the right to possess the Domain Name which was ultimately misappropriated by Defendants.  It completed the purchase of the domain name through Defendants' auction service as well as a required one-year renewal through Defendants' registrar.

58.    On May 29, 2024, in an e-mail from Defendants' domain name aftermarket service provider, Defendants acknowledged that Plaintiffs were indeed the rightful

15

owners of the Domain Names and made an offer to Plaintiffs to acquire the Domain Names on behalf of an unnamed client.

59.     On the same day, each of the Plaintiffs responded to Defendant's sales agent that they had already put the Domain Name to use and that (i) Plaintiffs Thorin and Crisby were working on a commercial launch of a product using that Calor.com Domain Name, and (ii) Plaintiff Prime had already curated an entire portfolio of butane-related domain names including Butane.com for a business that was already in the butane space. Plaintiff Thorin told Defendant that he and his company, Plaintiff Crisby, would have to be compensated an amount in the "high six figures" in order to consider another domain name for the project.  Plaintiff Prime said that it would present the offer to the already established business, but that it was looking for partnerships for its butane business as opposed to a purchase of the Butane.com domain name.

60.     Apparently not satisfied with either of the Plaintiffs responses, on June 4, 2024, (more than 100 days from the date the Domain Name expired, sixty-five (65) days after Plaintiff Prime purchased butane.com, and sixty (60) days after Plaintiff Thorin purchased the Domain Names via Defendant's auction system, Defendant intentionally exercised dominion and control over Plaintiffs' property through its domain name registrar services when it wrongfully took possession of the Domain Names.  Defendant deprived Plaintiffs of possession and use of the property.  See Ex. K and Ex. 11.

61.     Furthermore, after the Butane.com domain name was removed from Plaintiff Prime's account, GoDaddy replaced all of the content on Butane.com with a registrar parking page. This page not only offered the domain name for sale but also included a variety of paid advertisement links, from which the Defendants are generating revenue.  See Ex. 13.

62.     Defendant's misappropriation damages Plaintiffs in an amount to be proven at trial, but that exceeds $150,000.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND CLAIM FOR RELIEF
## (TRESSPASS TO CHATTEL)

63.     Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 62 above and incorporate them by reference.

64.     On or about April 5, 2024, Plaintiffs became the rightful owners of their respective Domain Names and had the right to possess the Domain Name which was ultimately misappropriated by Defendants.  They completed the purchases of the Domain Names through Defendants' auction service as well as a required one-year renewal through Defendants' registrar.

65.     On May 29, 2024, in an e-mail from Defendants' domain name aftermarket service provider, Defendants acknowledged that Plaintiffs were indeed the rightful owners to the Domain Names and made an offer to Plaintiffs to purchase the Domain Name.

66.     On the same day, the Plaintiffs responded to Defendant's sales agent that they had already put the Domain Name to use and that (i) Plaintiffs Thorin and Crisby were working on a commercial launch of a product using the Calor.com Domain Name, and (ii) Plaintiff Prime had already curated an entire portfolio of butane-related domain names including Butane.com for a business that was already in the butane space.  Plaintiff Thorin told Defendant that he and his company, Plaintiff Crisby, would have to be compensated an amount in the "high six figures" in order to consider another domain name for the project.  Plaintiff Prime said that it would present the offer to the already established business, but that it was looking for partnerships for its butane business as opposed to a purchase of the Butane.com domain name.

67.     Apparently not satisfied with either of the Plaintiffs' responses, on June 4, 2024, more than 100 days from the date the Domain Name expired, sixty-five (65) days after Plaintiff Prime purchased butane.com, and sixty (60) days after Plaintiff Thorin purchased the Domain Name via Defendant's auction system, Defendant intentionally dispossessed Plaintiffs of the Domain Names by inappropriately leveraging its domain

17

name registrar services to seize control of the domain name.  In so doing, Defendant deprived Plaintiffs of possession and use of the property.  See Ex. K and Ex. 11.

68.  Defendants dispossessed Plaintiffs of their domain names by inappropriately filing transfer information with ICANN and updating the WHOIS registry to reflect that Plaintiffs were no longer the owners of the Domain Name.

69.  Furthermore, after the Butane.com domain name was removed from Plaintiff Prime's account, Defendants replaced all of the content on Butane.com with a registrar parking page. This page not only offered the domain name for sale but also included a variety of paid advertisement links, from which the Defendants are generating revenue.  See Ex.13.

70.  Defendant's actions damages Plaintiffs in an amount to be proven at trial, but that exceeds $150,000.

### THIRD CLAIM FOR RELIEF
### (BREACH OF AUCTION MEMBERSHIP CONTRACT)

71.  Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 70 above and incorporate them by reference.

72.  Plaintiffs entered into an "Auction Membership Agreement" with Defendants (as a provider of domain name auction services) as of the date in which they placed bid on their respective domain names ("AMA").  See Ex. N.  Under the AMA, Defendant, as an aftermarket service provider, facilitates the buying and selling of currently registered domain name, including those domain names in their expiration period.

73.  The AMA requires that for an expired domain name auction to be completed, the winning bidder (called the "Buyer" in the AMA), must pay the winning bid amount plus a one (1) year renewal fee.  Once that is completed, "Change of ownership will begin upon the completion of the check-out process and receipt of Buyer's funds."  See *Id.*

74.     On March 31, 2024, Plaintiff Prime made the required payment of $19,765.43 (which included the Butane.com Auction Bid Price payable to Defendants' auction service provider, plus the price of the Domain Name renewal payable to Defendants' registrar service provider ($10.43).  Confirmation of Plaintiff's payment was e-mailed to Plaintiff Prime immediately after completing the order from Defendant. See Ex. 4.

75.     On April 5, 2024, Plaintiff Thorin made the required payment $11,427.17 (which included the Auction Bid Price plus the price of the Domain Name renewal ($22.17).   April 5, 2024, was approximately 41 days after the expiration of the Domain Name.

76.     On or about the same day that payments were made for their respective Domain Names, the transfer of the Domain Names to Plaintiffs was complete and the Domain Names were placed into Plaintiffs' GoDaddy *registrar* accounts.

77.     On June 4, 2024, More than 100 days after the domain name expired, sixty-five (65) days after Plaintiff Prime paid for butane.com, and nearly two months after Plaintiff Thorin acquired the Calor.com domain name, Defendant breached the AMA by nullifying the result of the Domain Name purchases.

78.     Defendant knew or should have known whether it had the right to offer the Domain Names for sale on its own auction platform.   At the time that Plaintiffs purchased their respective domain names, Defendant knew or should have known whether it had the right to collect fees for the Domain Names.  More importantly, at the time Defendant transferred ownership of the Domain Names to each Plaintiff, it knew or should have known whether it had the right to transfer ownership of the Domain Names.

79.     Defendant had a process by which the previous owner could have reclaimed the expired domain names so long as that was done within 45 days after the

expiration.  Defendants did not follow its own process, which also is a breach of the AMA.

80.     As a result of these multiple breaches of the AMA, Plaintiffs have suffered damages in an amount to be proven at trial, but that exceeds $150,000.

**FOURTH CLAIM FOR RELIEF**
**(BREACH OF REGISTRATION AGREEMENT)**

81.     Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 80 above and incorporate them by reference.

82.     At the moment the Domain Names transferred to Plaintiffs and were renewed for an additional one (1) year, services under the AMA were completed and Plaintiffs' relationship with Defendants was solely under the Domain Name Registration Agreement ("DNRA"), currently set forth at https://www.godaddy.com/legal/agreements/domain-name-registration-agreement, and attached hereto at Exhibit O.

83.     The DNRA does not provide a mechanism for Defendant, as a Registrar, to deny, cancel or transfer any renewal of a domain name, for an error committed by an expired domain name auction provider.

84.     By removing the Domain Names from Plaintiffs' registrar accounts due to an "error" committed by it as an auction service provider, Defendant breached the DNRA.  Although Defendants are both a registrar and an auction service provider, there is nothing in the DNRA that allows Defendants to use their position as a domain name registrar to correct errors by them performing non-registrar services (here, auction services).

85.     As a result of this breach of the DNRA, Plaintiffs have suffered damages in an amount to be proven at trial, but that exceeds $150,000.

20

1

2

**FIFTH  CLAIM FOR RELIEF**
**(BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AS**
**TO GODADDY DEFENDANTS)**

3

4

86.     Plaintiffs hereby restate and re-allege the allegations set forth in

paragraphs 1 through 85 above and incorporate them by reference.

5

6

87.     At least two contracts existed between Defendant and each of the

Plaintiffs.  The first of which was the AMA for the auction services, and the second,

7

Defendants' domain name registration agreement (DNRA).

8

9

88.      Pursuant to those contracts, Plaintiffs expected Defendant would comply

10

with its fiduciary duties, perform its professional obligations as an ICANN-Accredited

11

registrar, separate and apart from its role as a provider of other non-registrar services,

12

without impairing the businesses of Plaintiffs, and not convert Plaintiff's property,

opportunities, interests and expectancies for Plaintiffs' use of the Domain Names.  In

13

fact, Plaintiff Prime purchased Full Domain Protection' from Defendant GoDaddy for

14

Butane.com, a service that was expressly intended to prevent unauthorized transfers of

15

16

the Butane.com domain name. Ironically, Defendant GoDaddy carried out the very type

of unauthorized transfer that this service was designed to protect against.

17

18

89.      Furthermore, after the Butane.com domain name was removed from

19

Plaintiff Prime's account, GoDaddy replaced all of the content on Butane.com with a

20

registrar parking page. This page not only offered the domain name for sale but also

21

included a variety of paid advertisement links, from which the Defendants are

22

generating revenue.

23

90.     Pursuant to those contracts, Plaintiffs expected Defendant would comply

24

with its fiduciary duties, and not comingle its non-registrar services with it serving as an

25

ICANN-Accredited registrar, As a result of this breach of the covenant of good faith

26

and fair dealing, Plaintiffs have suffered damages in an amount to be proven at trial, but

27

that exceeds $150,000.

28

1
2

**SIXTH CLAIM FOR RELIEF**
**(TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE AS TO ALL DEFENDANTS)**

3
4

91.     Plaintiffs hereby restate and re-allege the allegations set forth in
paragraphs 1 through 90 above and incorporate them by reference.

5
6
7

92.     Defendants actively market their domain name registrar as one where you
can connect "your Websites + Marketing site to a domain . . . [within] . . . a few
minutes but can take up to 72 hours."

8
9
10
11

93.     In fact, on March 31, 2024 and April 5, 2024, in the receipts received by
Plaintiffs Prime and Thorin respectively, Defendant expressly tell Plaintiffs to "Activate
your products today.  You have new products or services in your account waiting to be
activated.  You've paid for them – now put them to work."  See Ex. E and Ex. 4.

12
13
14

94.     Defendant not only knows that many businesses begin using their domain
names immediately upon registering a domain name, but it actively markets this feature
of its system.

15
16
17

95.     Defendant knew or reasonably should have known that Plaintiffs had set
up MX Records on the Domain Name indicating that Defendant had been using the
Domain Name for conducting business via e-mail.

18
19

96.     Defendant's conduct has damaged Plaintiffs in an amount to be proven at
trial, but not less than $150,000.

20
21
22

**SEVENTH CLAIM FOR RELIEF**
**(TOURTOUS INTERFERENCE WITH  CONTRACT WITH RESPECT TO**
**PLAINTIFF THORIN/CRISBY)**

23
24
25

97.     Plaintiffs hereby restate and re-allege the allegations set forth in
paragraphs 1 through 96 above and incorporate them by reference.

26
27

98.     A contract existed between Plaintiffs Thorin and Crisby and QLSC to
create a dating application based entirely on the Domain Name.

28

22

99.    Defendant was made aware of the fact that the Domain Name was going to be used to launch a new product or service on May 29, 2024, when it inquired about purchasing the Domain Name for a "client".

100.    Defendant intentionally interfered with the contract between Plaintiffs Thorin/Crisby and QLSC causing Plaintiff Thorin to breach that contract.

101.    Defendant acted improperly when it unilaterally converted Plaintiff's property.

102.    As a result of Defendant's conduct, Plaintiffs Thorin and Crisby were damaged, in an amount to be proven at trial, but at least $150.000.

### EIGHTH CLAIM FOR RELIEF
### (GROSS NEGLIGENCE)

103.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 102 above and incorporate them by reference.

104.    Defendants owed Plaintiffs a duty of care to ensure that domain name auctions are properly conducted and that the sale of domain names as a result of such auctions are final and without error.

105.    Defendants breached this duty by not only negligently auctioning off domain names that it claims should not have been auctioned, but also by recklessly allowing sixty-five (65) days in the case of butane.com and two (2) months in the case of Calor.com, to pass before informing Plaintiffs of the alleged "error" and misappropriating the Domains.

106.    Defendants' actions, in allowing such a significant period to elapse before reclaiming the domains, constitute gross negligence, demonstrating a reckless disregard for the rights and interests of Plaintiffs.

107.    As a direct and proximate result of Defendants' gross negligence, Plaintiffs have suffered significant harm, including but not limited to: (a) the loss of the Domain Names, (b) costs incurred in developing and promoting the Domain Names

23

during the two month period in which it owned the Domain Name, (c) business disruption and loss of potential revenue, and (d) reputational damage and loss of business opportunities.

108.    As a result of Defendant's gross negligence, Plaintiffs were damaged in an amount to be proven at trial, but at least $150,000.00.

## NINTH CLAIM FOR RELIEF
### (NEGLIGENCE)

109.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 108 above and incorporate them by reference.

110.    Defendants owed Plaintiff a duty of care to ensure that domain name auctions are properly conducted and that the sale of domain names as a result of such auctions are final and without error.

111.    Defendants breached this duty by negligently auctioning off domain names that it claims should not have been auctioned, and by failing to adequately verify the eligibility of the domain names for auction before offering them for sale.

112.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered significant harm, including but not limited to: (a) the loss of the Domain Names, (b) costs incurred in developing and promoting the Domain Names during the two month period in which it owned the Domain Name, (c) business disruption and loss of potential revenue, and (d) reputational damage and loss of business opportunities.

113.    As a result of Defendant's negligence, Plaintiffs were damaged in an amount to be proven at trial, but at least $150,000.00.

**TENTH CLAIM FOR RELIEF**
**(NEGLIGENT MISREPRESENTATION)**

114.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 113 above and incorporate them by reference.

115.    By placing the Domain Names up for auction through Defendant's aftermarket services, Defendant represented that it had the right to sell the Domain Names to anyone that placed bids on the Domain Name.

116.    By declaring Plaintiffs the winners of their respective auctions for the Domain Names, and requesting payment for the Domain Names, Defendant again was representing that it has the right to sell the Domain Names to the respective Plaintiffs, and that upon payment of the purchase price, Defendant had the right to transfer title of the Domain Names to Plaintiffs.

117.    Upon Defendant's own admission, Defendant failed to exercise reasonable care in securing the appropriate rights to sell and transfer the Domain Names to the Plaintiffs.

118.    Plaintiffs justifiably relied on Defendant's authority and ability to sell the Domain Names to Plaintiff.

119.    As a result of Defendant's negligence, Plaintiffs were damaged in an amount to be proven at trial, but at least $150,000.00.

**ELEVENTH CLAIM FOR RELIEF**
**(ESTOPPEL)**

120.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 119 above and incorporate them by reference.

121.    Defendant intentionally induced Plaintiffs to believe and have confidence that it was selling the Domain Names to the respective Plaintiffs.

25

122.    Upon consummating the sale of the Domain Name to Plaintiffs, Defendant intentionally induced Plaintiffs to believe and have confidence that Plaintiffs had owned all right, title, and interest in and to their respective Domain Names.  This was a material fact.

123.    Plaintiffs justifiably relied on Defendant's authority to sell the Domain Names, and to transfer all right, title and interest to the respective Plaintiffs.

124.    Plaintiffs were injured and damaged as a result of the reliance caused by Defendant, in an amount to be proven at trial but not less than $150,000.

## TWELFTH CLAIM FOR RELIEF
## (INJUNCTIVE RELIEF)

125.    Plaintiffs hereby restate and re-allege the allegations set forth in paragraphs 1 through 124 above and incorporate them by reference.

126.    Pursuant to A.R.S. s. 12-1801, the Court has the authority to grant injunctive relief.

127.    Plaintiffs have suffered irreparable injury or there is a substantial likelihood that they will continue to suffer substantial irreparable injury as a result of Defendant's conversion and misappropriation of each Plaintiff's property.

128.    Upon information and belief, Defendant's will attempt to aid further conversion and/or misappropriation  of Plaintiffs' Domain Names if they are not enjoined from selling and/or transferring the Domain Name to a third party.

129.    Plaintiffs have no adequate remedy at law to protect its property from being further misappropriated by Defendant if the Defendants are not restrained.

130.    The misappropriation of the Domain Names to a third party would constitute an irreparable injury, with incalculable damages for Plaintiffs.

131.    Plaintiffs are entitled to a temporary restraining order and permanent injunction against Defendants.

WHEREFORE, Plaintiffs are entitled to and prays that the court enter a temporary restraining order and permanent injunction against Defendants ordering the following:

(a) That the Defendants be enjoined from allowing any modifications or changes to each Domain Name's registration information during the pendency of this litigation.  This includes not allowing the Domain Names to be deleted or transferred to any third party.

(b) That Defendants shall not be allowed to tamper with or interfere with, in any fashion, Plaintiffs use of the Domain Names.

(c) That Defendants do not interfere with Plaintiffs' ongoing business.

## **PUNITIVE DAMAGES**

132.    Defendants engaged in conduct, acts, and omissions to serve their own interests and pursued a course of conduct having reason to know of, yet consciously disregarding a substantial right that such conduct might significantly injure the rights of each Plaintiff.  The willful and intentional acts, as set forth in this complaint are of such an aggravated or outrageous nature to indicate motive by an evil mind, coupled with an evil hand.

133.    In addition, Defendants intentionally co-mingled its services as a domain name auction provider or aftermarket services with that of an ICANN-Accredited Registrar that provides critical domain name registration services to third parties.  As the largest ICANN-Accredited Registrar, Defendant believes that it can engage in self-help by using its separate domain name registrar to "correct errors" it commits as an auction service provider and misappropriate Plaintiff's Domain Name.  In fact, if Plaintiffs were aware that this was something Defendant could do, it would have transferred its Domain Name to another registrar that could not take such actions.  In other words, had Plaintiffs purchased the domain names through Defendants' auction

service, then subsequently transferred to Domain Names to a separate registrar, Defendant would not have been able to use its registrar service to convert Plaintiffs' property. If there were any errors by the auction service provider, it would have had to bring a legal action to attempt to recover the names. Rather than following the appropriate legal courses of action, Defendant abused its position as a registrar to misappropriate plaintiffs' property.

134.   Therefore, a punitive damages award against Defendant in an amount to be proven at trial is fully justified and warranted and would have the effect of deterring others from committing similar acts and omissions.

135.   Plaintiffs are entitled to a temporary restraining order and permanent injunction against Defendants.

## DEMAND FOR JURY TRIAL

136.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a jury trial of all issues triable to a jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.   Entry of judgment in favor of Plaintiffs against Defendants

B.   An order awarding Plaintiffs damages in an amount to be proven at trial, but in an amount no less than $75,000;

C.   Pre-judgment and post-judgment interest;

D.   An order awarding Plaintiffs its costs and attorneys' fees to the extent allowed by law.

E.   A temporary restraining order enjoining Defendants GoDaddy Inc. and GoDaddy.com LLC, its officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with it, from directly or indirectly

allowing either the calor.com domain name or butane.com to expire and/or revert to the domain name registry to be generally available for purchase by third parties;

F.      A temporary restraining order enjoining Defendants GoDaddy, Inc. and GoDaddy.com LLC from preventing or frustrating Plaintiffs' right, pursuant to GoDaddy's Domain Registration Agreement, to renew the registrations of the Domains;

G.      A temporary restraining order enjoining Defendants GoDaddy, Inc., GoDaddy.com LLC, 123-Reg Limited, their officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with it (collectively "Defendants") from selling or otherwise transferring any ownership interest in either the calor.com or butane.com domain names, or purchasing any ownership interest in the domains, or otherwise accepting transfer of any ownership interest in the Domain Names;

H.      An order to show cause why a preliminary injunction should not issue, pursuant to Fed. R. Civ. P. 65, enjoining Defendants from directly or indirectly committing the above-described acts during the pendency of this action; and

I.      Granting Plaintiffs any such other and further relief as this Court deems just and proper, or that Plaintiffs may be entitled to as a matter of law or equity.


[SPACE LEFT INTENTIONALLY BLANK]

1   DATED:  September 25, 2024,

2

3

4                                                    */s/ Isaac S. Crum*
                                                   Isaac S. Crum, #026510
5                                                  icrum@messner.com
6                                                  MESSNER REEVES LLP
                                                   7250 N. 16th St. Ste 410
7                                                  Phoenix, Arizona 85020
                                                   Telephone: (602) 457-5059
8                                                  Facsimile: (303) 623-0552

9
                                                   Jeffrey J. Neuman (*pro hac vice*
10                                                 forthcoming)
11                                                 Jeff@jjnsolutions.com
                                                   JJN Solutions, LLC
12                                                 9445 Brenner Ct.
                                                   Vienna, VA 22180
13

14                                                 *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                               30

1

## LIST OF EXHIBITS

2

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Def. 123 Reg Domain Expiration Polcy |
| B | Def. GoDaddy Auction Website – Listing Types |
| C | March 31, 2024 WHOIS Record for Calor.com |
| D | Notification of Winning Auction Bid for Calor.com |
| E | Payment Receipt for Calor.com |
| F | June 2024 Screenshot of Calor.com |
| G | August 2024 Screenshot of Calor.com |
| H | DNS MX Record Change for Calor.com |
| I | Def. GoDaddy Sales E-mail to Plaintiff Thorin |
| J | Plaintiff Crisby Response to GoDaddy Sales E-mail |
| K | Def. Notification of Misappropriation of Calor.com |
| L | Plaintiff Crisby 6-17-24 Letter to Defendants |
| M | Plaintiff Crisby 7-17-24 Follow Up Letter to Defendants |
| N | Def. Auction Membership Agreement |
| O | Def. Domain Name Registration Agreement |
| 1 | March 27, 2024 WHOIS Record for Butane.com |
| 2 | Def. 3-27-24 E-mail to Plaintiff Prime about Auction Names incl. Butane.com |
| 3 | Butane.com Winning Bid Notice |
| 4 | Payment Receipt for Butane.com |
| 5 | Payment Receipt for additional butane-related domains |
| 6 | Plaintiff Prime web development initiation |
| 7 | Linked-in Account for Butane.com |
| 8 | Instagram Account for Butane.com |
| 9 | Butane.com Website (reproduced on Butane.net) |
| 10 | Def. GoDaddy Sales E-mail to Plaintiff Prime |
| 11 | Def. 6-4-24 Notice of Misappropriation of Butane.com |
| 12 | Def. Notice of Refund for Full Protection Service |
| 13 | Butane.com Website Content  on 9-24-24 |
| 14 | Plaintiff Prime 8-5-24 E-mail to Defendants |
| 15 | Def. August 14, 2024 E-mail |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28